**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

Honeywell International Inc. & Honeywell
LNG LLC

     *Plaintiffs,*

v.

Gary Armitage,

     *Defendant.*

Case No. _____

**JURY TRIAL DEMANDED**

**VERIFIED COMPLAINT**

1. Plaintiffs Honeywell International Inc. and Honeywell LNG LLC (collectively, "Honeywell"), by and through undersigned counsel, hereby files this Verified Complaint to halt the ongoing and threatened misappropriation, public disclosure, and contemplated sale of Honeywell's trade secrets by Defendant Gary Armitage ("Defendant" or "Mr. Armitage"), a recently terminated welder formerly assigned to a Honeywell manufacturing facility at Port Manatee in Palmetto, Florida.

2. Mr. Armitage was hired by Honeywell in January 2025. In the summer of 2025, Mr. Armitage made threats to Honeywell colleagues, including making statements that he had "a bunch of guns at home." Not surprising, after a full and thorough investigation, Honeywell terminated Mr. Armitage's employment for cause in December 2025.

3. During the summer of 2025, in direct violation of Honeywell's Plant Rules and Regulations, Mr. Armitage smuggled a personal phone into a restricted production area of the facility and photographed proprietary internal features of Honeywell's products, capturing confidential and trade secret information, which Honeywell has invested substantial resources to develop and protect.

1

4.      After his termination, in apparent retaliation, Mr. Armitage sent texts and voice messages to Honeywell in which he stated that he possessed pictures taken from within secure areas of Honeywell's facility that contain Honeywell trade secrets, including blue prints taken from within Honeywell's facility. Mr. Armitage ultimately published $21^{1}$ photographs on publicly accessible online platforms, exposing Honeywell's confidential designs, configurations, and manufacturing know-how to competitors, customers, and the general public.

5.      Although it would seem that things could not get worse, they did. In addition to stating that he possessed photographs of Honeywell's trade secrets, Mr. Armitage further stated that he was in contact with a Honeywell competitor to whom Mr. Armitage was planning to sell photographs of Honeywell blue prints.

6.      After Mr. Armitage's threats and public disclosure of Honeywell trade secrets, Honeywell sent Mr. Armitage a cease and desist demand requesting Defendant remove the posts and return all Honeywell property and information. Defendant refused to comply.

7.      Mr. Armitage's conduct has caused ongoing injury to Honeywell. This lawsuit is filed to protect Honeywell's confidential business and trade secret information and to hold Mr. Armitage accountable. Accordingly, for the conduct alleged herein, Honeywell seeks immediate injunctive relief and damages against Mr. Armitage for misappropriation of trade secrets under the Florida Uniform Trade Secrets Act (Fla. Stat. § 688.001, et seq.) and misappropriation of trade secrets under the Defend Trade Secrets Act (18 U.S.C. § 1836).

8.      Mr. Armitage's deliberate and retaliatory course of misconduct has inflicted real and ongoing harm on Honeywell. Absent judicial intervention, that harm will continue. It's high time Mr. Armitage's conduct ends. In support of its claims, Honeywell states as follows:

---

[1] Some of the posted photographs are duplicative.

2

**THE PARTIES**

9.      Honeywell International Inc. is a Delaware corporation with its principal place of business at 855 S. Mint Street, Charlotte, North Carolina 28202.

10.      Honeywell LNG LLC is a Delaware limited liability company with its principal place of business at 6575 Snowdrift Rd, Allentown, Lehigh, Pennsylvania 18106. Honeywell LNG LLC is an indirect, wholly owned subsidiary of Honeywell International Inc.

11.      Honeywell LNG LLC owns and operates a facility at 2525 Inland Transport Street, Palmetto, Florida 34221 (the "Port Manatee Facility") at which Honeywell manufactures certain proprietary products and employs proprietary processes that constitute trade secrets within the meaning of 18 U.S.C. § 1839(3) and Fla. Stat. § 688.002(4).

12.      Defendant Gary Armitage is a former employee of Honeywell and, upon information and belief, resides in Port Richey, Florida.

**JURISDICTION AND VENUE**

13.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Honeywell asserts a claim arising under the laws of the United States, specifically the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq. ("DTSA").

14.      This Court possesses supplemental jurisdiction over Honeywell's state law claim under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001 et seq. ("FUTSA") pursuant to 28 U.S.C. § 1367 because the FUTSA claim arises out of the same case or controversy as the federal DTSA claim and shares a common nucleus of operative fact, including Mr. Armitage's unauthorized photographing, public disclosure, and threatened sale of misappropriated trade secrets from Honeywell.

15.      Alternatively and additionally, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs. The value of

the trade secrets at issue, the irreparable competitive harm threatened, and the damages and equitable relief sought, including exemplary damages and attorneys' fees, far exceed $75,000.

16.    Honeywell's trade secrets are used in, and are related to products and services used in or intended for use in, interstate and foreign commerce, satisfying the jurisdictional element of 18 U.S.C. § 1836(b)(1).

17.    This Court has personal jurisdiction over Mr. Armitage because Mr. Armitage currently resides in Florida, was employed by Honeywell in Manatee County, Florida, committed the tortious acts giving rise to this action in Florida, and has purposefully directed conduct at Honeywell and its operations within this District.

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Mr. Armitage's employment at the Port Manatee Facility, Mr. Armitage's unauthorized photographing of trade secrets at the Port Manatee Facility, and the threatened and ongoing harm to Honeywell's operations at least at the Port Manatee Facility.

## FACTUAL BACKGROUND

### A. *Plaintiff Honeywell and Its Liquid Natural Gas Business*

19.    Honeywell is a diversified, multinational technology and manufacturing company that designs, develops, manufactures, and supplies advanced products, systems, and solutions for customers in the aerospace, performance materials, safety and productivity, and building technologies sectors throughout the United States and worldwide. Honeywell's products are sold and shipped in interstate and foreign commerce, and Honeywell's research, development, and manufacturing operations are conducted across multiple states and countries, including at the Port Manatee Facility.

20.    In 2024, Honeywell completed its $1.8B acquisition of Air Products' liquefied natural    gas    process    technology    and    equipment    business.

4

https://www.honeywell.com/us/en/press/2024/09/honeywell-completes-acquisition-of-air-products-liquefied-natural-gas-process-technology-and-equipment-business.

21.　　After the Air Products acquisition, Honeywell is now the world's leading provider of natural gas liquefaction technology, coil-wound heat exchangers and related equipment and services, with more than 120 plants designed, manufactured and shipped across the U.S. and worldwide. https://ess.honeywell.com/us/en/solutions/lng/liquefaction#.

22.　　Liquefaction of natural gas is an important process. Natural gas is the least carbon-intensive fossil fuel and many countries around the world look to natural gas as a clean energy source. https://www.energy.gov/hgeo/articles/lng-basics. Although natural gas can be transported in its traditional gaseous state, for example via pipeline, transportation is obviously limited to areas that can be reached by a pipeline. Enter liquid natural gas. Unlike natural gas in gaseous state, liquid natural gas can be transported via ship, rail, or truck. Additionally, the volume of natural gas when in a liquid state is about 600 times smaller than natural gas in its gaseous state. *Id.* Liquefaction of natural gas thus allows natural gas to be safely transported around the world.

23.　　Liquefaction of natural gas is achieved by use of a heat exchanger. Honeywell manufactures heat exchangers and related components, accessories, and other liquified natural gas equipment (collectively, the "Honeywell LNG Products") at its Port Manatee Facility.  Heat exchangers enable the liquefaction and subcooling of natural gas by handling extreme cryogenic temperatures and high pressures through a robust, helically wound tube bundle design. An example of a coil-wound heat exchanger is shown below.



### B. Honeywell's Secure Port Manatee Facility

24.    The Port Manatee Facility comprises production buildings and adjacent office space situated on a secured industrial parcel. The production areas are the locations in which Honeywell trade secrets are most directly accessible, including areas where proprietary product designs, configurations, components, manufacturing processes, tooling, and welding techniques are visible to personnel performing work on the floor.

25.    The entirety of the Port Manatee Facility is enclosed by a continuous perimeter security fence designed to prevent unauthorized access and to demarcate the boundary of Honeywell's controlled premises. The facility also includes surveillance coverage at points of access.

26.    Access to the Port Manatee Facility for hourly employees, including the position formerly held by Defendant, is controlled through a badge-activated turnstile. Employees are required to present and swipe an individually issued badge at the turnstile each time they enter or exit the secured area.

27.    Access to the Port Manatee Facility outside of an employee's regularly scheduled work hours is restricted. Employees are not permitted to enter or remain inside the Port Manatee Facility unless they are on duty or are within thirty (30) minutes before or after

their scheduled shift. Off-schedule access requires the employee to report to the security guard station and to swipe their badge so that the off-schedule entry is logged and supervised.

28.     A staffed security post is maintained at the Port Manatee Facility and Honeywell employs both security personnel and electronic monitoring to observe activity at the perimeter. Visitors to the Port Manatee Facility are required to check in at the security post, present identification, and be escorted or separately credentialed before being permitted access to any portion of the Port Manatee Facility.

29.     Within production areas at the Port Manatee Facility, Honeywell maintains additional layers of access control and operational restrictions designed to safeguard trade secrets. For example, Honeywell prohibits personal cell phones, personal cameras, and personal recording equipment in the production areas. Honeywell also prohibits removal of Honeywell property, records, and other material from the Port Manatee Facility.

30.     Honeywell holds numerous trade secrets at the Port Manatee Facility related to Honeywell LNG Products, including, but not limited to: (a) non-public product designs, configurations, internal geometries, component arrangements, and assembly details of the Honeywell LNG Products; (b) proprietary manufacturing processes, fabrication techniques, welding parameters, tolerances, and quality control protocols; (c) proprietary materials specifications, formulations, and supplier-specific inputs; (d) engineering drawings, schematics, computer-aided design files, and bills of materials; (e) production know-how, process sequencing, tooling, fixturing, and shop-floor methods; and (f) other technical and business information that derives independent economic value from not being generally known to other persons who could obtain economic value from its disclosure or use (collectively, the "Trade Secrets").

31.     The Trade Secrets are not generally known to the public, to Honeywell's competitors, or to others who could obtain economic value from their disclosure or use. The

7

Trade Secrets cannot be readily properly ascertained through reverse engineering, independent development, or other proper means without the expenditure of substantial time, expense, and effort.

32.    The Trade Secrets derive significant independent economic value, both actual and potential, from not being generally known and not being readily ascertainable by proper means. The Trade Secrets provide Honeywell a substantial competitive advantage in the markets in which the Honeywell LNG Products are sold, including by enabling Honeywell to offer superior performance, reliability, and cost characteristics that competitors cannot replicate without access to the same proprietary information.

33.    Honeywell has invested, and continues to invest, millions of dollars and many years of cumulative research, engineering, and manufacturing experience in the development, refinement, and protection of the Trade Secrets. The continued secrecy of the Trade Secrets is essential to preserving the value of Honeywell's investment and to maintaining Honeywell's market position.

34.    Disclosure, dissemination, sale, or transfer of the Trade Secrets to competitors, the general public, or any unauthorized third party would cause Honeywell immediate and irreparable competitive harm, including loss of competitive advantage, harm to customer and supplier relationships, and unjust enrichment of competitors who would obtain the benefit of Honeywell's proprietary information without bearing the corresponding development costs. Once disclosed publicly, the Trade Secrets cannot be restored to secrecy, and the resulting harm to Honeywell cannot be fully measured or remedied by monetary damages alone.

### C. *Honeywell Hires Mr. Armitage and Defines Access to Confidential Information*

35.    Honeywell hired Mr. Armitage at the Port Manatee Facility as welder in January 2025. Mr. Armitage performed a variety of welding operations on Honeywell's heat exchangers and worked as a confined space attendant.

36.     In the course and scope of his employment as a welder at the Port Manatee Facility, Mr. Armitage was granted access to restricted production areas of the Port Manatee Facility and to Honeywell LNG Products, components, processes, designs, and configurations that constitute Honeywell trade secrets and confidential and proprietary information, including the Trade Secrets.

37.     Honeywell goes to great lengths to maintain the secrecy of the Trade Secrets, including the information that Mr. Armitage stole and disclosed.

38.     All employees at the Port Manatee Facility are required to sign and acknowledge the Honeywell Port Manatee Manufacturing Facility Plant Rules and Regulations (the "Plant Rules").

39.     Mr. Armitage signed and acknowledged the Plant Rules (effective June 1, 2017) on January 27, 2025. A true and correct copy of which is attached hereto as **Exhibit A**.

40.     The Plant Rules, as signed by Mr. Armitage, specify that "[t]he following are acts of misconduct are considered serious and may result in disciplinary action up to and including termination":

No. 8: "Due to the sensitivity of the Intellectual Property within the facility the *use of personal cell phones is <u>prohibited</u> in the production* areas at all times. Cell phones can only be used in office areas, break rooms and locker rooms. Personal cell phones should only be used on scheduled breaks or other non-working time. . . ." *Id.* (emphasis added).

No. 27: "Due to the sensitivity of the Intellectual Property within the facility *personal cameras and recording equipment are <u>unauthorized</u> in the production areas* and adjacent offices." *Id.* (emphasis added).

No. 29: "*Removing or attempting to remove Company property*, records, or other material or property including personal tools from the premises *without written authorization* (gate pass required and signed by supervisor)." *Id.* (emphasis added).

9

41.    The Plant Rules also include the following requirements regarding employee safety and security:

No. 4: "All hourly Employees must enter and exit the property through the turnstile by swiping their own badge, and stay inside the security fence during scheduled work hours, including paid break times. Exceptions require the permission of supervision and punching out of the time system if leaving the property. All Salaried exempt and non-exempt employees must enter and exit the property through the turnstile or Admin building by swiping his/her own badge." *Id.*

No. 5: "For safety and security reasons an employee should not enter the plant interior or remain inside the plant unless on duty or within 30 minutes of the time he/she is scheduled to start or end work. If employees need to enter the plant during non-scheduled working time (e.g. to quickly pick up a personal item) they should report to the guard and swipe in, and out on exiting, using their own badge or a temporary badge provided by security." *Id.*

42.    Honeywell also maintains a Code of Business Conduct, which states that employees should protect sensitive information and ensure unauthorized personnel are not permitted access to such information. The Code of Business Conduct also states that all Honeywell confidential information should be returned to Honeywell before an employee's last day of employment.

43.    The Port Manatee Facility also has signage reminding employees that photography in the production areas is not permitted. Honeywell takes the protection of its trade secrets and protection thereof seriously. Employees at the Port Manatee Facility have been disciplined and even terminated for using cell phones in production areas of the Port Manatee Facility.

44.     Additionally, on their first day of employment, all employees who work at the Port Manatee Facility go through a lengthy training program, in which they learn safety regulations and general rules for the Port Manatee Facility. During this training program, all employees are taught that taking photographs within the production areas of the Port Manatee Facility is strictly prohibited. The attendance records confirm that Mr. Armitage was present for the training program. Moreover, employees at the Port Manatee Facility are constantly reminded of the strict no-photography rule during routine training and meetings.

45.     Based at least on the Plant Rules, signage at the plant, the training programs/meetings, and Honeywell's Code of Business Conduct, Mr. Armitage knew, or in the exercise of reasonable care should have known, that the information to which he had access at the Port Manatee Facility constituted Honeywell trade secrets and confidential proprietary information, that such information was provided to Mr. Armitage in confidence and solely for the purpose of performing his job duties, and that any unauthorized photographing, removal, disclosure, sale, or transfer of such information was strictly prohibited.

### D.  Mr. Armitage's Tenure at Honeywell and Eventual Termination

46.     On June 25, 2025, Mr. Armitage improperly filled out confined space paperwork, which violated Honeywell's hole watch policy.  On July 2, 2025, Honeywell issued a warning memorandum to Mr. Armitage, who signed the memorandum on July 15, 2025.

47.     On July 16, 2025, during a conversation with a colleague regarding workplace training requirements, Mr. Armitage expressing his frustration with the training, stated that the situation was "driving him crazy," and added that he had "a bunch of guns at home."

48.     Mr. Armitage's statements were in direct violation of at least Honeywell's Code of Business Conduct, violence prevention policy, and policy on workplace harassment, discrimination, and retaliation prevention. Notably, the Plant Rules explicitly state that

violations of Honeywell's harassment policies or code of ethics "may result in termination." **Exhibit A**, Rule No. 21.

49.    On July 17, 2025, following the reporting of Mr. Armitage's statements, Mr. Armitage was placed on paid leave.

50.    Due to the nature of Mr. Armitage's statements, Mr. Armitage's badge access to the Port Manatee Facility was revoked and a physical security alert was issued for the Port Manatee Facility.

51.    After a full and thorough investigation into the incident, including interviews with numerous witnesses to the incident, on December 5, 2025, Mr. Armitage's employment with Honeywell was terminated for cause effective immediately.

### E. Mr. Armitage's Misappropriates Honeywell's Trade Secrets and Threatens to Sell Those Trade Secrets.

52.    Upon information and belief based on metadata from Google Maps and based on Mr. Armitage's own statements to Honeywell, in June and July 2025, without knowledge of Honeywell, Mr. Armitage carried his personal phone into the production area of the Port Manatee Facility in direct violation of the Plant Rules and captured photographs of the interior components, configuration, and proprietary design features of a Honeywell LNG Product then under fabrication as well as photographs of documentation, including blueprints, related to Honeywell LNG Products (collectively, the "Subject Photographs"). The Subject Photographs depict non-public, proprietary, and confidential information belonging to Honeywell that constitutes trade secret material under the DTSA and FUTSA.

53.    Mr. Armitage took the Subject Photographs without the knowledge, authorization, or consent of Honeywell, and did so in deliberate circumvention of the access controls, signage, and written prohibitions in effect at the Port Manatee Facility. Mr. Armitage had no legitimate business purpose for capturing, retaining, or transmitting the Subject Photographs.

12

54.    Mr. Armitage thereafter removed the Subject Photographs from the Port Manatee Facility on his personal phone, again without written authorization from Honeywell, in further violation of the Plant Rules.

55.    Following Mr. Armitage's capture and removal of photographs depicting the Trade Secrets from the Port Manatee Facility, Mr. Armitage published certain of the Subject Photographs to one or more publicly accessible internet platforms, including at least Google Maps. Additionally, Mr. Armitage threatened to sell the Trade Secrets to one or more of Honeywell's competitors with whom Mr. Armitage was allegedly already in contact.

56.    On February 10, 2026, Mr. Armitage sent a text message to a Honeywell employee stating that, "I guess it a good thing that I have pics of blue prints of a lot of everything that is built there so now I'm talking to [your competitor] to buy it all from me with my Honeywell badge." Attached to Mr. Armitage's text message were certain pictures that he had captured from within the Port Manatee facility.

57.    Mr. Armitage later left a voice message with a Honeywell employee stating, "It's a good thing I'm talking to . . . your guy's competitor—and they are gonna pay me for all the pictures of blue prints and everything I have on my phone." Mr. Armitage further confirmed that it was he who posted the Subject Photographs to Google Maps stating in his voice message "Because I left you guys a . . . Google Review on Google Maps showing I have pictures of stuff."

58.    On information and belief, based on metadata available from Google Maps, Mr. Armitage first posted certain of the Subject Photographs to Google Maps on or about February 2026. Mr. Armitage published the Subject Photographs without the authorization, consent, or knowledge of Honeywell, and in direct contravention of the Plant Rules.

59.    The Subject Photographs were posted to a forum that is accessible to the general public, including Honeywell's competitors, without password protection, paywall, or other

13

meaningful access restrictions. The posts were viewable, downloadable, and capable of being shared by any member of the public with an internet connection.

60. On information and belief, the Subject Photographs have been viewed by numerous third parties, and Honeywell is unable at this time to determine the full universe of persons or entities who have accessed, downloaded, or further disseminated the images.

61. The Subject Photographs depict, among other things, the internal configuration, component arrangement, dimensional relationships, proprietary design features, manufacturing tolerances, weld geometries, and other non-public design and process attributes of Honeywell LNG Products manufactured at the Port Manatee Facility. The trade secrets depicted in the Subject Photographs are not ascertainable from the publicly available exterior of the product or from any publicly disclosed Honeywell materials.

62. Mr. Armitage posted the Subject Photographs on the Google Maps link to the Port Manatee Facility, thereby drawing attention to the fact that the proprietary features depicted belong to Honeywell and to Honeywell LNG products, thereby maximizing the competitive harm to Honeywell and the value of the disclosure to competitors. Copies of screenshots of Mr. Armitage's posts on Google Maps, including metadata where available and dates of posting, are included within Exhibit A (Declaration of Charlie Wall) to Plaintiff's contemporaneously filed Motion for Temporary Restraining Order (the "Wall Declaration").

63. Each publication of the Subject Photographs by Mr. Armitage constitutes an unauthorized disclosure of Honeywell's trade secrets within the meaning of 18 U.S.C. § 1839(5) and Fla. Stat. § 688.002(2), and each continued day during which the Subject Photographs remain available on Google Maps compounds the irreparable harm to Honeywell described herein.

**F. Honeywell Asks Mr. Armitage to Cease and Desist from Further Misappropriation of the Trade Secrets, but Mr. Armitage Chooses to Retaliate.**

14

64.     On February 17, 2026, promptly after discovering Mr. Armitage's unauthorized photographs and online postings of Honeywell trade secrets, Honeywell, through outside legal counsel at Faegre Drinker Biddle & Reath LLP ("Faegre"), sent a cease and desist letter to Mr. Armitage at his last known physical address (the "Cease and Desist Letter"). A true and correct copy of the Cease and Desist Letter is attached hereto as **Exhibit B.**

65.     The Cease and Desist Letter identified Mr. Armitage's unauthorized conduct, including that:

- Mr. Armitage contacted Honeywell's Human Resources Department and threatened to sell Honeywell confidential information to one of Honeywell's competitors;

- Mr. Armitage stated that he possessed Honeywell blueprints in his possession;

- Mr. Armitage posted photographs of Honeywell facilities and equipment on Google Maps;

- Mr. Armitage made threatening phone calls to Honeywell employees.

66.     The Cease and Desist Letter expressly demanded, among other things, that Mr. Armitage immediately: (a) cease and desist from making threats to Honeywell employees, (b) cease and desist from use or disclosure of Honeywell confidential information, (c) remove all photographs of Honeywell confidential information posted by Mr. Armitage, (d) permanently delete all Honeywell confidential information in Mr. Armitage's possession; and (e) provide written certification of Mr. Armitage's compliance with the foregoing demands.

67.     The Cease and Desist Letter set a deadline of February 24, 2026 for Defendant's full compliance and written certification that he would comply with all Honeywell's requests in the Cease and Desist Letter.

68.     Defendant received the Cease and Desist Letter on approximately February 18, 2026. Shortly, after receipt of the Cease and Desist Letter, Mr. Armitage left a voice message

15

with Faegre stating that he received the Cease and Desist Letter, but suggesting he never actually threatened Honeywell. Mr. Armitage did not indicate that he planned to comply with Honeywell's demands.

69. Notwithstanding receipt of the Cease and Desist Letter, Mr. Armitage has wholly failed and refused to comply with any of its demands. Mr. Armitage has not removed the Subject Photograph postings, has not returned any Honeywell property, records, or materials, has not identified any recipients of the trade secret information, and has not provided any written certification of compliance.

70. To make matters worse, in response to the Cease and Desist Letter, Mr. Armitage retaliated against Honeywell. Upon information and belief, based on metadata from Google Maps, Mr. Armitage posted additional Subject Photographs on Google Maps in April 2026, which depict additional Trade Secrets.

71. Despite Honeywell's demands, the Subject Photographs remain publicly accessible on Google Maps as of the date of filing of this Verified Complaint, and the Trade Secrets continue to be exposed to competitors, customers, and the general public.

72. The conduct of Defendant has caused, is causing, and, unless enjoined, will continue to cause Honeywell immediate, substantial, and irreparable injury for which there is no adequate remedy at law.

73. Mr. Armitage's express threat to sell Trade Secrets to competitors creates an ongoing and imminent risk that Honeywell's most sensitive proprietary processes, designs, and product configurations will be transferred to entities positioned to use them to Honeywell's direct competitive detriment. The harm flowing from such a transfer would be incalculable and effectively permanent.

74. Honeywell's harm is further aggravated by Mr. Armitage's refusal to respond to or comply with the Cease and Desist Letter, which demonstrates that Mr. Armitage will not

16

voluntarily cease the unlawful conduct and confirms that judicial intervention is necessary to prevent further dissemination.

75.     Monetary damages alone are inadequate to remedy the harm Honeywell has suffered and will continue to suffer. The full extent of the damage caused by public disclosure or competitor acquisition of Honeywell's trade secrets cannot be measured with reasonable certainty, because such damage extends to lost future business opportunities, diminished market position, impaired research and development advantages, and the permanent loss of secrecy itself.

## COUNT I

### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836

76.     Honeywell repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

77.     Honeywell is the lawful owner of the trade secrets at issue in this action, which include, without limitation, the proprietary designs, configurations, components, dimensions, tolerances, assemblies, manufacturing processes, and internal product architecture depicted in the photographs Defendant captured at the Port Manatee Facility and later publicly disclosed on at least Google Maps, as further described above and as further detailed in the Wall Declaration.

78.     None of this information is readily ascertainable through proper means, nor can it be easily replicated through publicly available sources.

79.     The Trade Secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Honeywell's competitors would derive substantial economic value from access to the Trade Secrets, and Honeywell would suffer corresponding competitive harm.

80. The Trade Secrets are related to products that Honeywell manufactures at the Port Manatee Facility and that are used in, sold in, and intended for use in interstate and foreign commerce, including by being shipped to and used by customers located outside the State of Florida and outside the United States. *See e.g.*, https://www.honeywell.com/us/en/press/2026/01/honeywell-modular-coil-wound-heat-exchanger-technology-to-accelerate-production-at-commonwealth-lng-facility; https://www.honeywell.com/us/en/news/featured-stories/2024/12/honeywell-lng-technology-to-support-lower-carbon-liquefied-natural-gas-facility-in-the-middle-east.

81. Honeywell has taken reasonable measures under the circumstances to keep the Trade Secrets secret. Such measures include, without limitation: (a) maintaining a secured perimeter fence around the Port Manatee Facility; (b) requiring badge-controlled turnstile entry and exit; (c) limiting on-site presence to scheduled work hours and a brief window before and after; (d) prohibiting personal cell phones in production areas at all times due to the sensitivity of Honeywell's intellectual property; (e) prohibiting personal cameras and recording equipment in production areas and adjacent offices due to the sensitivity of Honeywell's intellectual property; (f) prohibiting the removal of Honeywell property, records, or other material from the premises without prior written authorization; (g) requiring employees to acknowledge receipt of and adherence to the Plant Rules; and (h) imposing discipline up to and including termination for violations. Honeywell also provides significant training programs at the Port Manatee Facility to ensure all employees are aware of the no cell phone/photography rules.

82. One reason Honeywell adopted such stringent security measures is because its confidential information and trade secrets derive independent economic value from not being readily known to or readily accessible by the public through proper means. If Honeywell's competitors gained free access to Honeywell's confidential information and trade secrets—

without having to incur the years or decades of investment and expenses that Honeywell devoted to developing that technology—Honeywell would be significantly damaged.

83.     Mr. Armitage knew or had reason to know that he was not allowed to photograph and remove Honeywell's confidential information and trade secrets from the Port Manatee Facility. This is based at least on the Code of Business Conduct, Plant Rules, plant signage, and extensive training programs. And even if they had not, even the most rudimentary application of business ethics or thou-shalt-not-steal sensibilities would have prevented Defendant's theft.

84.     Despite all that, and acting deliberately rather than inadvertently, Mr. Armitage improperly captured photographs of the Trade Secrets and removed said photographs from Honeywell's Port Manatee Facility. Additionally, based on his own representations, Mr. Armitage stole other Honeywell trade secrets, such as blueprints. Mr. Armitage posted these photographs on at least Google Maps thereby disclosing the Trade Secrets to the public. Mr. Armitage has also threatened to sell the Trade Secrets to Honeywell's competitors. These acts were undertaken covertly, without authorization, and for the purpose of damaging Honeywell and/or obtaining financial gain for Mr. Armitage.

85.     Mr. Armitage misappropriated the Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by acquiring, disclosing, and using the Trade Secrets without Honeywell's express or implied consent and through improper means, including theft, breach of duties to maintain secrecy, violation of plant rules enumerated during plant training programs, and breach of the Plant Rules. Mr. Armitage's improper means included, without limitation, photographing the internal features of a Honeywell product on the production floor using a personal cell phone and removing the photographs from the premises without written authorization. These acts were in direct violation of at least the Code of Business Conduct, Plant Rules, plant signage, and extensive training programs

19

86.     At the time of acquisition, Mr. Armitage knew or had reason to know that the Trade Secrets were acquired by improper means and that Mr. Armitage owed a duty to Honeywell to maintain the secrecy of, and to limit the use of, such information. Mr. Armitage's duties arose from, among other things, Mr. Armitage's employment relationship with Honeywell, the Plant Rules, Honeywell's Code of Business Conduct, knowledge of Honeywell rules through extensive training programs, and plant signage.

87.     Mr. Armitage further misappropriated the Trade Secrets by disclosing them, without Honeywell's consent, to the general public through online postings to at least Google Maps, and by threatening to disclose, sell, transfer, or otherwise provide additional Trade Secrets to Honeywell's competitors.

88.     Mr. Armitage's misappropriation is ongoing. The publicly posted images remain accessible online despite the Cease and Desist Letter, and Mr. Armitage has refused to remove them, refused to return Honeywell's property, and continues to threaten further disclosures and sales of Trade Secrets to competitors.

89.     All of Mr. Armitage's egregious acts of misappropriation occurred well after May 11, 2016, which is the effective date of the Defend Trade Secrets Act.

90.     Mr. Armitage's public posting of the Subject Photographs on Google Maps and threatened sale of Honeywell trade secrets to a competitor were not confidential disclosures to a government official or attorney, were not made solely to report or investigate a suspected violation of law, and were not made in a sealed court filing.

91.     As a direct and proximate result of Mr. Armitage's misappropriation, Honeywell has suffered and will continue to suffer substantial damages, including actual losses, unjust enrichment to Mr. Armitage or to third parties, loss of competitive advantage, loss of trade secret status, and harm to customer and business relationships, in amounts to be proven at trial.

20

92. Mr. Armitage's misappropriation has caused and, unless enjoined, will continue to cause immediate and irreparable harm to Honeywell for which there is no adequate remedy at law.

93. Mr. Armitage has been unjustly enriched by his misappropriation of Honeywell's trade secrets. Mr. Armitage has threatened to sell Honeywell's trade secrets to Honeywell's competitors.

94. Unless enjoined, Mr. Armitage's continued possession and ongoing use of Honeywell's trade secrets risks imminent, existential, and irreparable harm to Honeywell. Honeywell simply cannot compete on a fair basis if its expensive and highly valuable trade secrets developed over years of effort and investment are freely disclosed to Honeywell's competitors.

95. Mr. Armitage acted with actual knowledge that his conduct was wrongful, unlawful, and expressly prohibited, including by Honeywell's written policies and by well-established standards of ethics.

96. Mr. Armitage's conduct was malicious in that it was undertaken intentionally and without just cause, with the specific purpose of harming Honeywell's competitive position and enriching himself at Honeywell's expense.

97. Unless enjoined, Mr. Armitage's continued possession, disclosure, and ongoing use of Honeywell's trade secrets risks imminent, existential, and irreparable harm to Honeywell. 18 U.S.C. § 1836(b)(3)(A).

98. Mr. Armitage's misappropriation was and is willful and malicious. 18 U.S.C. § 1836(b)(3)(C). Mr. Armitage acted with knowledge of Honeywell's ownership of the Trade Secrets, knowledge of the Plant Rules, and conscious disregard of Honeywell's rights, and Mr. Armitage has compounded the misappropriation by ignoring the Cease and Desist Letter and by issuing further threats of disclosure and sale.

99.    Because of Mr. Armitage's willful and malicious misappropriation, Honeywell is entitled to exemplary damages in an amount up to two times its actual damages, as well as reasonable attorneys' fees. 18 U.S.C. § 1836(b)(3)(C), (D).

## COUNT II

**Misappropriation of Trade Secrets Under the**
**Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001 et seq.**

100.    Honeywell repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

101.    Honeywell is the lawful owner of the trade secrets at issue in this action, which include, without limitation, the proprietary designs, configurations, components, dimensions, tolerances, assemblies, manufacturing processes, and internal product architecture depicted in the photographs Defendant captured at the Port Manatee Facility and later publicly disclosed on at least Google Maps.

102.    None of this information is readily ascertainable through proper means, nor can it be easily replicated through publicly available sources.

103.    The Trade Secrets derive independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Honeywell's competitors would derive substantial economic value from access to the Trade Secrets, and Honeywell would suffer corresponding competitive harm.

104.    Honeywell has taken reasonable measures under the circumstances to keep the Trade Secrets secret. Such measures include, without limitation: (a) maintaining a secured perimeter fence around the Port Manatee Facility; (b) requiring badge-controlled turnstile entry and exit; (c) limiting on-site presence to scheduled work hours and a brief window before and after; (d) prohibiting personal cell phones in production areas at all times due to the sensitivity of Honeywell's intellectual property; (e) prohibiting personal cameras and recording

22

equipment in production areas and adjacent offices due to the sensitivity of Honeywell's intellectual property; (f) prohibiting the removal of Company property, records, or other material from the premises without prior written authorization; (g) requiring employees to acknowledge receipt of and adherence to the Plant Rules; and (h) imposing discipline up to and including termination for violations. Honeywell also provides significant training programs at the Port Manatee Facility to ensure all employees are aware of the no cell phone/photography rules.

105.    One reason Honeywell adopted such stringent security measures is because their confidential information derived independent economic value from not being readily known to or readily accessible by the public through proper means. If Honeywell's competitors gained free access to Honeywell's confidential information and trade secrets—without having to incur the years or decades of investment and expenses that Honeywell devoted to developing that technology—Honeywell would be significantly damaged.

106.    Mr. Armitage knew or had reason to know that he was not allowed to photograph and remove Honeywell's confidential information and trade secrets from the Port Manatee Facility. This is based at least on the Code of Business Conduct, Plant Rules, plant signage, and extensive training programs. And even if they had not, even the most rudimentary application of business ethics or thou-shalt-not-steal sensibilities would have prevented Mr. Armitage's theft.

107.    Despite all that, and acting deliberately rather than inadvertently, Mr. Armitage improperly captured photographs of the Trade Secrets and removed said photographs from Honeywell's Port Manatee Facility. Additionally, based on his own representations, Mr. Armitage stole other Honeywell trade secrets, such as blueprints. Mr. Armitage posted these photographs on at least Google Maps thereby disclosing the Trade Secrets to the public. Mr. Armitage has also threatened to sell the Trade Secrets to Honeywell's competitors. These acts

23

were undertaken covertly, without authorization, and for the purpose of damaging Honeywell and/or obtaining financial gain for Mr. Armitage.

108. Mr. Armitage misappropriated the Trade Secrets within the meaning of Fla. Stat. § 688.002(2) and 688.002(4) by acquiring, disclosing, and using the Trade Secrets without Honeywell's express or implied consent and through improper means, including theft, breach of duties to maintain secrecy, violation of plant rules enumerated during plant training programs, and breach of the Plant Rules. Mr. Armitage's improper means included, without limitation, photographing the internal features of a Honeywell product on the production floor using a personal cell phone and removing the photographs from the premises without written authorization. These acts were in direct violation of at least the Code of Business Conduct, Plant Rules, plant signage, and extensive training programs

109. At the time of acquisition, Mr. Armitage knew or had reason to know that the Trade Secrets were acquired by improper means and that Mr. Armitage owed a duty to Honeywell to maintain the secrecy of, and to limit the use of, such information. Mr. Armitage's employment relationship with Honeywell, the Plant Rules, Honeywell's Code of Business Conduct, knowledge of Honeywell rules through extensive training programs, and plant signage.

110. Mr. Armitage further misappropriated the Trade Secrets by disclosing them, without Honeywell's consent, to the general public through online postings to at least Google Maps, and by threatening to disclose, sell, transfer, or otherwise provide additional Trade Secrets to Honeywell's competitors.

111. Mr. Armitage's misappropriation is ongoing. The publicly posted images remain accessible online despite the Cease and Desist Letter, and Mr. Armitage has refused to remove them, refused to return Honeywell's property, and continues to threaten further disclosures and sales of Trade Secrets to competitors.

112. As a direct and proximate result of Mr. Armitage's misappropriation, Honeywell has suffered and will continue to suffer substantial damages, including actual losses, unjust enrichment to Mr. Armitage or to third parties, loss of competitive advantage, loss of trade secret status, and harm to customer and business relationships, in amounts to be proven at trial.

113. Mr. Armitage's misappropriation has caused and, unless enjoined, will continue to cause immediate and irreparable harm to Honeywell for which there is no adequate remedy at law.

114. Mr. Armitage has been unjustly enriched by his misappropriation of Honeywell's trade secrets. Mr. Armitage has threatened to sell Honeywell's trade secrets to Honeywell's competitors.

115. Unless enjoined, Mr. Armitage's continued possession and ongoing use of Honeywell's trade secrets risks imminent, existential, and irreparable harm to Honeywell. Honeywell simply cannot compete on a fair basis if its expensive and highly valuable trade secrets developed over years of effort and investment are freely disclosed to Honeywell's competitors.

116. Mr. Armitage acted with actual knowledge that his conduct was wrongful, unlawful, and expressly prohibited, including by Honeywell's written policies and by well-established standards of commercial ethics.

117. Mr. Armitage's conduct was malicious in that it was undertaken intentionally and without just cause, with the specific purpose of harming Honeywell's competitive position and enriching himself at Honeywell's expense.

118. Unless enjoined, Mr. Armitage's continued possession, disclosure, and ongoing use of Honeywell's trade secrets risks imminent, existential, and irreparable harm to Honeywell. Fla. Stat. § 688.003.

25

119.    Mr. Armitage's misappropriation was and is willful and malicious. Fla. Stat. § 688.004(2) and § 688.005. Defendant acted with knowledge of Honeywell's ownership of the Trade Secrets, knowledge of the Plant Rules, and conscious disregard of Honeywell's rights, and Mr. Armitage has compounded the misappropriation by ignoring the Cease and Desist Letter and by issuing further threats of disclosure and sale.

120.    Because of Mr. Armitage's willful and malicious misappropriation, Honeywell is entitled to exemplary damages in an amount not exceeding twice any award of actual loss and unjust enrichment damages, and reasonable attorneys' fees. Fla. Stat. § 688.005.

121.    Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant, and grant the following relief:

a) Preliminary and permanent injunctive relief restraining Mr. Armitage, and anyone acting on Mr. Armitage's behalf or in concert with Mr. Armitage, from taking, accessing, using, disclosing, or continuing to possess Honeywell's confidential information and trade secrets, and requiring return of such information and documents;

b) Preliminary and permanent injunctive relief requiring Mr. Armitage to (i) identify the location, nature, and form of any confidential, proprietary, or trade secret information

26

obtained from Honeywell and derivatives thereof; (ii) return and permanently delete (after satisfying litigation preservation obligations) all such information from any device, account, or storage location within Mr. Armitage's possession, custody, or control; (iii) certify such deletion in writing; and (iv) identify all persons or entities to whom Mr. Armitage disclosed or made available such information and the dates, manner, and content of each such disclosure;

c) An order requiring Mr. Armitage to remove or cause the removal of all public postings containing Honeywell confidential information or trade secrets;

d) An order requiring Mr. Armitage to preserve and produce for forensic imaging all devices, accounts, cloud storage locations, messaging applications, email accounts, social media accounts, and online platform accounts used to capture, store, transmit, post, or discuss Honeywell confidential information or trade secrets.

e) An order authorizing *ex parte* seizure of property necessary to prevent the propagation or dissemination of Honeywell's trade secrets pursuant to 18 U.S.C. § 1836(b)(2);

f) A judgment against Mr. Armitage for the full amount of Honeywell's losses proximately caused by Mr. Armitage as well as the benefits Mr. Armitage wrongly accrued and/or disgorgement of his wrongful profits;

g) A damages award to Honeywell, including but not limited to actual damages, compensatory damages, and/or exemplary damages;

h) An award of punitive and exemplary damages and attorneys' fees and costs to Honeywell as authorized by law;

i) An award of pre-judgment and post-judgment interest at the maximum rates allowed by law; and

j) An award of any other relief as may be deemed just and proper.

Respectfully submitted:

27

**ALBEE & STEVENS, PLLC**
Counsel for Plaintiffs
5544 Central Avenue
St. Petersburg, FL 33707
Phone: (727) 217-2500
Fax:     (727) 217-2501

By: <u>*/s/C. Bryant Boydstun, Jr.*</u>
   **C. BRYANT BOYDSTUN, JR.**
   FBN 179083
   bboydstun@albeestevens.com
   **SCOTT B. ALBEE, ESQ.**
   FBN 980870
   salbee@albeestevens.com
   aspleadings@albeestevens.com

## **VERIFICATION**

My name is Adam Doane and, pursuant to 28 U.S.C. § 1746, I hereby affirm that I am over 18 years of age and am competent to make the following Verification:

a) I am Assistant General Counsel, IP at Honeywell International Inc.

b) I have read the foregoing Verified Complaint for Injunctive Relief and Damages and hereby verify that the allegations of facts contained therein are true and correct to the best of my knowledge.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 24, 2026

/s/ *Adam J. Doane*
Adam Doane

29